UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**RAE L.,**

**Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:22-cv-00921-TPK

OPINION AND ORDER

## OPINION AND ORDER

    This case is before the Court to consider a final decision of the Commissioner of Social Security which denied Plaintiff's applications for social security disability benefits and supplemental security income.  That final decision was issued by an Administrative Law Judge on July 28, 2022, following a remand from this Court.  After filing the complaint in this case, Plaintiff  moved for judgment on the pleadings (Doc. 9) and the Commissioner filed a similar motion (Doc. 11).  For the following reasons, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **GRANT** the Commissioner's motion, and **DIRECT** the Clerk to enter judgment in favor of the defendant Commissioner.

### I.  BACKGROUND

    Plaintiff protectively applied for supplemental security income on June 12, 2015 and for disability benefits on July 8, 2015, alleging in both applications that she became disabled on May 13, 2015.  After initial administrative denials of her claim, Plaintiff appeared at a hearing before an Administrative Law Judge on January 11, 2018.  The ALJ issued an unfavorable decision on May 25, 2018, and after the Appeals Council denied review, Plaintiff appealed to this Court.  Pursuant to a stipulation of the parties filed in Case No. 1:19-cv-00126, the Court remanded the case for rehearing.  Following the remand, a different ALJ held two hearings, the first on July 1, 2021, at which a vocational expert, Rocco J. Meola, testified, and the second on December 9, 2021, at which Plaintiff and a different vocational expert, Jay Steinbrenner, testified.

    The ALJ issued an unfavorable decision on August 2, 2022.  He found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2018, and that she had not engaged in substantial gainful activity since her alleged onset date.  Next, the ALJ determined that Plaintiff suffered from severe impairments including primary headache disorder, fibromyalgia, multilevel spinal degeneration, right sacroiliitis, polysubstance use disorder in remission with relapses, and mental impairments identified as bipolar disorder,

anxiety disorder, depressive disorder, post-traumatic stress disorder, and attention deficit disorder. He further found that none of these impairments, considered singly or in combination, met the criteria for disability under the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ concluded that through March 25, 2022 Plaintiff had the ability to perform a limited range of sedentary work. He determined that she could occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps as well as balance. However, she could not climb ladders, ropes, and scaffolds, work at unprotected heights or around dangerous machinery, or operate a motor vehicle. Also, she needed to avoid flashing or bright lights and exposure to loud noise. From a mental standpoint, the ALJ determined that Plaintiff could understand, remember, and carry out simple and routine instructions and tasks and could interact occasionally with supervisors, co-workers, and the general public. Next, focusing on the period after March 25, 2022, the ALJ found that Plaintiff could still perform sedentary work, but she could lift and carry up to 20 pounds continuously and up to 50 pounds frequently, could sit for eight hours a day, could stand for one hour continually and 2 hours total, could walk for 15 minutes continually and one hour total, could occasionally push and pull, and could operate right foot controls frequently and left foot controls occasionally. Also, she could not climb ramps, stairs, ladders, ropes, or scaffolds, nor could she drive, work around unprotected heights, or work around dangerous moving mechanical parts. Her mental limitations included not only being restricted to simple and routine instructions and tasks and occasional interaction with others but also no independent decision-making and only minimal changes in work routine and processes.

Plaintiff had past relevant work as a conveyor feeder/off bearer for a dry cleaning business and as a fast food worker, but both jobs were performed at the light exertional level, so the ALJ determined that Plaintiff was not able to do those jobs in light of her limitations. However, based on the evidence supplied by the vocational expert, the ALJ concluded that Plaintiff could do unskilled sedentary jobs like semi-conductor bonder and table worker. He also found that those jobs existed in significant numbers in the national economy. As a result, he concluded that she was not under a disability as defined in the Social Security Act.

In her motion for judgment on the pleadings, Plaintiff raises three issue, stated *verbatim* as follows:

> 1. The ALJ impermissibly cherry-picked the opinions of Dr. Siddiqui and Dr. Ransom.
>
> 2. The ALJ failed to properly evaluate the opinions of Plaintiff's treating providers.
>
> 3. The ALJ failed to support his step five finding with substantial evidence where the jobs available for the ALJ's second RFC finding do not clearly constitute "significant numbers."

Plaintiff's memorandum, Doc. 9-1, at 1.

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 37 years old at the time of the first administrative hearing, first testified that since her onset date, she had done some work watching a baby for her cousin's daughter three days a week.  Prior to that, she had worked taking cigarette orders online and at a dry cleaning establishment, where she put uniform garments together and placed them on a rack.  She also testified about a job she had at a Tim Horton's, which she left due to physical issues.

At the time of the hearing, Plaintiff had just moved into a new apartment with her eleven-year-old daughter, with her older daughter and son helping out with chores like laundry.  She was able to do dishes and sweep the floor.  She said that due to pain and anxiety, she had trouble sleeping.  Her anxiety also affected her when grocery shopping and driving.  Many days Plaintiff simply watched television or used her phone.  She did not think she could type as part of a job due to pain in her arms and hands, and that applied to any activity requiring repetitive hand movements.  Plaintiff said she could walk but lacked good balance, and also testified that she did not have an active social life apart from her family.

Next, Plaintiff testified about her pain.  She described various medications, creams, patches, and injections which she had tried, and said they either didn't work or made things worse.  However, she said that her anxiety was her most significant problem and that she could have an anxiety attack even during family gatherings if there were too many people around.

At the December, 2021 hearing, Plaintiff said that she was living by herself in a different apartment, and before that had been living with her 22-year-old son.  She had not driven a car in two years because she had seizures.  Her father had been taking her to the grocery store once a month and she had a small store across the street which she went to frequently and another one about ten minutes away.  She depended on other people to do her laundry.  Plaintiff testified that she had worked for three days at a dollar store in 2019 but not otherwise since the last hearing.

When asked about her physical abilities, Plaintiff said she could sit for 15 to 20 minutes, stand about the same amount of time, and walk to the grocery store.  She could not bend down but could squat, and she was not supposed to lift more than three pounds.  She could not reach overhead and had trouble using her hands.  Plaintiff also identified issues with concentration, focus, and short-term memory, and said she had panic attacks as well.  She said she had to stop the job at Tim Horton's because she dropped things and by the time her shift ended her entire body ached and she had numbness and tingling in her hands and feet.  Finally, she testified about where she was receiving counseling and treatment for substance abuse.

The vocational expert, Jay Steinbrenner, first testified that Plaintiff's past work could be characterized as a conveyor feeder/off-bearer and as a fast food worker.  They were both

unskilled jobs and performed at the light exertional level. He was then asked questions about a person with Plaintiff's vocational profile who could work at the sedentary level with a number of postural restrictions and who could not drive or operate dangerous machinery, who had certain manipulative and environmental restrictions, and who was limited to simple work with only occasional contact with others. He responded that such a person could not do Plaintiff's past work but could be employed as a semiconductor bonder, table worker, or telephone/switchboard operator. He also gave numbers for those jobs as they existed in the national economy. Mr. Steinbrenner further testified that the allowable absenteeism rate for these jobs would be one time per month and that the employee could not be off task for more than 15% of the time.

After the hearing, the ALJ sent a set of interrogatories to Mr. Steinbrenner. The ALJ asked him to assume a slightly different residual functional capacity mirroring the finding set forth above for that capacity after March 25, 2022. Mr. Steinbrenner responded that someone so limited could still do the semi-conductor bonder and table worker jobs, and he said there were 13,301 such jobs in the national economy. (Tr. 794-96).

### B. Medical Evidence

Given the fact that Plaintiff's claims of error deal exclusively with the opinions rendered by both treating sources and consultative examiners, a detailed explanation of the other medical evidence is not required. That evidence is well-summarized in Plaintiff's memorandum, and consists mainly of records indicating that Plaintiff had sought consistent treatment for what was diagnosed as fibromyalgia and for a mood disorder with anxiety. She had multiple physical complaints and also reported symptoms of depression and severe anxiety. The views of her primary treating sources are set forth more fully below.

### C. Opinion Evidence

Dr. Siddiqui conducted a consultative internal medical examination on September 21, 2015. Plaintiff's complaints at that time included fibromyalgia and chronic pain as well as anxiety and depression. She told Dr. Siddiqui that she experienced significant pain in all of her joints and that she had also been diagnosed with arthritis. Plaintiff said she could cook, clean, shop, and do laundry as well as dress herself. On examination, her gait was normal and she could walk on heels and toes without difficulty. She had some limitation of motion in the lumbar spine and while the range of motion in her neck and shoulders was normal she complained of pain in those areas as well as in her hips and ankles. Dr. Siddiqui diagnosed fibromyalgia, chronic pain, and degenerative arthritis and he thought she was mildly to moderately limited in her ability to sit, stand, climb, push, pull, and carry heavy objects. (Tr. 312-16).

The following month, Plaintiff saw Dr. Ransom for an adult psychiatric evaluation. She told Dr. Ransom that she had been prescribed medication for anxiety and depression by her family physician. Plaintiff said she experienced panic attacks twice monthly and occasionally had difficulty concentrating. During the examination, her affect was full and her mood was

neutral. Dr. Ransom thought Plaintiff's only limitations were in dealing with complex tasks, relating to others, and coping with stress, and those limitations were all mild. (Tr. 324-27).

On December 1, 2015, Debra Longbine, a nurse practitioner, wrote a letter stating that Plaintiff was not employable due to cervical pain, fibromyalgia, depression, and anxiety. (Tr. 1753). She subsequently completed a form in 2016 stating that Plaintiff was moderately or very limited in ten work-related areas, including being very limited in her ability to function in a work setting at a consistent pace. (Tr. 1758-59). Ms. Longbine completed a similar form in 2018 which indicated some improvement in Plaintiff's ability to perform the mental functions of work, but which stated she was very limited in her ability to lift, carry, push, pull, use her hands, or climb stairs. (Tr. 1764-65).

Gregory Groth, a psychiatric physician's assistant who saw Plaintiff monthly for one and one-half years, completed a questionnaire on January 18, 2018, noting that she exhibited reduced energy, motivation, and interests as well as anxiety around some people and children. He thought she would be off task for 10% of the time if working but absent about two days per month based on feelings of fatigue, tardiness, low motivation, and anxiety. (Tr. 388-92).

Also in January of 2018, someone from WNY Medical (according to Plaintiff's memorandum, it was Joseph Gross, a nurse practitioner) completed a Treating Medical Source Statement indicating that Plaintiff had symptoms of fibromyalgia including multiple tender points, chronic fatigue, muscle weakness, and frequent severe headaches. The reporter did not believe Plaintiff could be employed on a full-time basis because she was not able to sit or stand for any period of time and because she could not maintain regular attendance and be punctual within customary tolerances. She had other mental limitations as well, including the need to be off task more than 30% of the time and to miss more than four days of work per month. (Tr. 394-98).

Dr. Ransom saw Plaintiff again on February 23, 2022, for a consultative psychiatric evaluation. At that time, Plaintiff had received treatment for mental health disorders in 2017 and 2018, but was not currently doing so. She reported difficulty concentrating and sleeping and said she had anxiety around people, but she was not experiencing clinical levels of depression and did not have full-blown panic attacks. Dr. Ransom did note that she had difficulty following Plaintiff's train of thought and that Plaintiff's affect was labile on a mild level. As far as limitations are concerned, Dr. Ransom thought Plaintiff had a mild impairment in her attention and concentration and in her immediate and remote memory skills. Those translated into moderate limitations in understanding, remembering, and applying both simple and complex instructions and directions as well as using reason to make work-related decisions, interacting with others, and sustaining attention and concentration to work at a consistent pace. She had the same degree of limitation in sustaining an ordinary routine and regular attendance at work, regulating emotions, controlling behavior, and maintaining well-being. All of this was secondary to moderate bipolar disorder. (Tr. 3646-50).

On March 25, 2022, Dr. Schwab conducted an internal medicine examination. Plaintiff

reported to him that she suffered from fibromyalgia, osteoarthritis, and a seizure disorder. On examination, her gait was full and she could walk on her heels but not her toes. She had full range of motion in her cervical and lumbar spines but straight leg raising was positive on the left side. She also had 16 trigger points. Dr. Schwab thought that Plaintiff should be restricted from driving and should avoid heights, ladders, and moving machinery. She was also restricted from prolonged walking and climbing stairs and ladders. (Tr. 3655-58).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

### IV.  DISCUSSION

#### A.  Cherry-Picking Consultative Opinions

In her first claim of error, Plaintiff argues that the ALJ failed to incorporate or explain how he accounted for many of the mental limitations described in Dr. Ransom's 2022 report and that he did not explain why he found that Plaintiff was only mildly, rather than mildly to moderately, limited in her ability to sit, as Dr. Siddiqui concluded in his report. She asserts that it is reversible error for an ALJ to focus on only those portions of an expert report that favor a

finding of no disability to the exclusion of more negative findings, particularly when the ALJ does not provide any rationale for disregarding that evidence. The Commissioner responds that all of the moderate restrictions which Dr. Ransom found were accommodated by limiting Plaintiff to simple, routine work, and that the ALJ provided valid reasons for rejecting Dr. Siddiqui's opinion that Plaintiff might have been moderately limited in her ability to sit.

It is important to understand the rationale behind the ALJ's challenged decisions. Turning first to Dr. Ransom's opinions, the ALJ reviewed her 2015 opinion and gave it some weight based on the fact that other evidence in the record suggested a more restrictive mental capacity than indicated in this report. Next, the ALJ considered the 2022 opinion and concluded that the opinion "tends to support the claimant's mental limitations throughout each period [that is, before and after March 25, 2022] better than her 2015 opinion." The ALJ therefore assigned it significant weight and "relied upon [it] to continue to limit the claimant to understanding, remember (sic), and carry out (sic) simple and routine instructions and tasks, and to occasional interaction with [others]." (Tr. 428). The ALJ also cited the opinion and other records to justify limiting Plaintiff to "no independent decision-making and to tolerating no more than minimal changes in work routine and processes." As Plaintiff points out, however, the ALJ did not explicitly incorporate Dr. Ransom's conclusions about Plaintiff's ability to sustain attention and concentration to work at a consistent pace, sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior, and maintain well-being, all of which, according to Dr. Ransom, were moderately limited.

The Commissioner's argument centers around the proposition that even had these limitations been made a part of the residual functional capacity finding, the ALJ would still have been justified in finding that Plaintiff could perform simple jobs not involving decision-making or changes in the work routine and not requiring more than occasional interaction with others. The Commissioner cites to cases such as *Melissa L. v. Comm'r of Social Security*, 2022 WL 593452 (W.D.N.Y. Feb. 28, 2022) and *Washburn v. Colvin*, 286 F.Supp. 3d 561 (W.D.N.Y. 2017), both of which hold, as stated in *Washburn*, that "[i]t is well settled that a limitation to unskilled work sufficiently accounts for moderate limitations in work-related functioning." *Washburn*, 286 F. Supp. 3d at 566. The decision in *Melissa L.* cites to numerous other cases which concluded that various moderate limitations, including in the areas of "understanding, remembering, or applying complex directions and instructions, in sustaining concentration and performing a task at a consistent pace, in sustaining an ordinary routine and regular attendance at work, and in regulating emotions, controlling behavior and maintaining well-being" - essentially the same limitations imposed by Dr. Ransom. *See Melissa L.*, at *5. Given that these types of moderate limitations were accommodated by the ALJ's restriction of Plaintiff to simple work with additional restrictions, the Court agrees with the Commissioner that Plaintiff has not shown that, had the ALJ expressly adopted all of the limitations contained in Dr. Ransom's report, the outcome of the case would be different. That is sufficient to resolve this first contention.

As noted above, Dr. Siddiqui, in his 2015 opinion, concluded that Plaintiff was mildly to moderately limited in her ability to perform a number of activities, including sitting. The ALJ found that could sit for eight hours a day both prior to and after March 25, 2022, which finding

does not appear to reflect a moderate limitation in this area. The ALJ gave this opinion significant weight with respect to every activity but sitting due to the fact that Dr. Siddiqui conducted a thorough examination and his opinion was consistent with the other medical evidence. (Tr. 424). He then explained that "[f]or the same reasons, I find the claimant to be no more than mildly limited from sitting." *Id*. The ALJ did not just cite Dr. Siddiqui's findings in support of this determination, however, but made reference to a number of other records which also supported his finding of moderate limitations in other areas. That reference is problematic; none of those records appear to address specifically the extent of any limitation in sitting, and most of them confirm a diagnosis of fibromyalgia which included pain in the hips and lower back. Consequently, it is not entirely clear why the ALJ rejected that specific portion of Dr. Siddiqui's opinion.

Again, however, the Commissioner argues that any error here is harmless because even a moderate limitation in the ability to sit is deemed to be consistent with the ability to perform sedentary work. Sedentary work, of course, requires a claimant to be able to sit for at least six hours in an eight-hour work day and may involve up to two hours of walking or standing. *See* 20 C.F.R. §404.1567(a); SSR 83-10. This Court has repeatedly held that someone who is moderately limited in her ability to sit may well be able to perform sedentary jobs. *See, e.g. Kevin M. v. Kijakazi,* 2022 WL 2704527, at *2 (W.D.N.Y. July 12, 2022) (collecting cases); *see also Rebecca J. v. Comm'r of Soc. Sec.*, 2024 WL 4750811, at *3 (W.D.N.Y. Nov. 12, 2024) ("Courts within the Second Circuit have recognized that moderate limitations in prolonged sitting are not necessarily inconsistent with the ability to perform the up to six hours of sitting (at approximately two-hour intervals, interrupted by morning and afternoon breaks, and a lunch period) required for sedentary work"). Therefore, even if the ALJ erred by failing to provide a sufficient rationale for rejecting this portion of Dr. Siddiqui's opinion, any error is harmless, and Plaintiff's first claim of error does not provide a sufficient basis for ordering a remand.

### B. Treating Source Opinions

As her next claim of error, Plaintiff argues that the ALJ erred in his evaluation of the opinions of the treatment providers, particularly nurse practitioner Gross and physician's assistant Longbine. She asserts that the ALJ did not apply the factors of supportability and consistency when assigning weight to these opinions and also failed to take into account the fact that fibromyalgia does not usually present with observable findings on examination. The Commissioner counters that the ALJ provided valid reasons for discounting much of these two opinions including the fact that they were not consistent with the medical records and appeared to be based largely on Plaintiff's subjective description of her symptoms, which statements the ALJ found to be somewhat inconsistent with the record.

Again, the key to resolving this contention is examining the ALJ's decision. The ALJ first considered nurse practitioner Gross's opinion (referred to by the ALJ as a statement generated by WNY Medical, PC). After correctly recognizing that this was not an opinion fro an acceptable medical source, the ALJ assigned it minimal weight "because neither NP Gross' examination findings from that day support the severity of the mental and physical limits or

-8-

absenteeism rates nor do other treatment providers' contemporary office notes." (Tr. 426). The ALJ also reasoned that "this opinion appears to be overly reliant on the claimant's subjective complaints" due to the fact that Plaintiff had said her migraines were well-controlled, her medications were not changed, and the examination revealed only minimal findings. *Id*. The ALJ then considered the multiple opinions expressed by Ms. Longbine, who was also not an acceptable medical source, and he found that her observations were generally consistent with other evaluations of Plaintiff's mental symptoms. As to physical symptoms, however, the ALJ stated that there was an inconsistency between Ms. Longbine's examination findings and office notes and the more extreme physical limitations identified in her reports, noting that those restrictions were "more clearly aligned with the claimant's self-reports." *Id*. He therefore assigned those portions of her reports little weight. The ALJ also noted that Ms. Longbine had periodically excused Plaintiff from work, but, citing to the fact that her notes "reflected normal physical and mental findings," concluded that these statements corresponded with exacerbations of Plaintiff's symptoms rather than long-term disability. (Tr. 426-27).

As the ALJ noted, neither a nurse practitioner nor a physician's assistant is an "acceptable medical source." In terms of evaluating such opinions, this Court has said:

> For claims filed before March 27, 2017 ... the ALJ is require to evaluate every medical opinion in the record from acceptable medical sources, 20 C.F.R. § 416.927(c), as well as opinions from sources who are not acceptable medical sources or are nonmedical sources, and it may be appropriate to give more weight to the latter opinions depending on the particular facts of the case. 20 C.F.R. § 416.927(f).

*Kathleen R. v. Saul*, 2021 WL 671602, at *5 (W.D.N.Y. Feb. 22, 2021). The same factors which apply to the evaluation of a treating source opinion apply to this type of opinion evidence a well, and those factors do include determining if the opinions are consistent with the record, including other opinion evidence, and if they are supported either by the findings which have been made by those providers or by other treating or examining sources. *See generally id.* at *7.

Here, it is evident from those portions of the ALJ's decision recited above that the ALJ applied the correct legal standard. He specifically mentioned both the supportability and consistency factors and correctly determined that there were both inconsistencies between some portions of the opinions in question (and particularly Ms. Longbine's description of physical limitations) and the other findings of record, and that some of the statements made in the opinions did not appear to have any support in the record. Overall, the Court finds no error in how the ALJ evaluated these opinions, and this second claim of error does not provide a basis for remand.

### C. Step Five Determination

Plaintiff's third and final claim of error relates to the ALJ's determination that, after

March 25, 2022, Plaintiff could still perform jobs that exist in significant numbers in the national economy. As noted above, although the ALJ determined that Plaintiff could do three jobs with job totals exceeding 70,000 prior to March 25, 2022, Mr. Steinbrenner eliminated one of those jobs in his interrogatory answers concerning the period after that date, leaving some 13,000-plus jobs available.  Citing cases from a number of other jurisdictions which held that job numbers in that range did not constitute significant numbers, Plaintiff contends that the matter should be remanded for further findings on this issue.  The Commissioner's position is that this number of jobs is, at least in the Second Circuit, considered significant enough to warrant a finding of no disability.

The Commissioner has the better of this argument.  The lead cases cited in the Commissioner's memorandum, *Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018), acknowledges that there is no bright line test to be applied here, but concluded that numbers between 9,000 and 10,000 have generally been considered to be sufficient to satisfy the Commissioner's step five burden.  An almost identical number of jobs (13,400) was found to be significant by the Court in *Pichardo v. Comm'r of Soc. Sec.*, 714 F. Supp. 3d 183, 195 (E.D.N.Y. 2024), and there are many other similar decisions from this and other courts within this Circuit. *See, e.g, George v. Saul*, 2020 WL 6054654 (D. Conn. Oct. 14, 2020) (10,500 jobs); *Holly W. v. Comm'r of Soc. Sec.*, 2023 WL 4445586 (W.D.N.Y. July 11, 2023) (11, 800 jobs); *Sarah Ann Z. v. Comm'r of Soc. Sec.*, 2021 WL 1206516 (W.D.N.Y. Mar. 31, 2021) (9,840 jobs).  This third claim of error therefore lacks merit.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 9), **GRANTS** the Commissioner's motion (Doc. 11), and **DIRECTS** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security.

> **/s/ Terence P. Kemp**
> **United States Magistrate Judge**